## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **ANTHONY ROSA,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | **CASE NO.:** |
| **V.** | ) | |
| | ) | |
| **AUBURN UNIVERSITY-** | ) | **PLAINTIFF DEMANDS TRIAL** |
| **MONTGOMERY, and AUBURN** | ) | **BY STRUCK JURY** |
| **UNIVERSITY,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW, Anthony Rosa ("Plaintiff" or "Rosa"), by and through her undersigned counsel, and files this, her Complaint for Damages, and shows the Court as follows:

## I.    INTRODUCTION

Rosa brings this action against his former employer alleging it engaged in third party retaliation against him and created a retaliatory hostile work environment because his sister, who was also employed by Defendants, filed an EEOC Charge alleging gender discrimination in violation of Title VII. After Rosa's sister filed her charge the AUM and Auburn engaged in a pattern of retaliating against her family and friends. Rosa, himself, was wrongfully placed on administrative leave, not

promoted, terminated and then subjected to false statements and testimony about him during the investigations. Evidence of the record wherein the statements were proven false was destroyed by Carl Stockton, AUM and Auburn ignored exculpatory evidence, and his termination was upheld.

## II.    JURISDICTION

1.    This action for injunctive relief and damages is brought under 28 U.S.C. §§ 1331, 1343(4), 2201, 2202. The jurisdiction of this Court is invoked to secure protection for and to redress the deprivation of rights caused by the Defendant.

2.    This suit is authorized and instituted under Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended, the "Civil Rights Act of 1991;" 42 U.S.C. § 2000e, et seq. (Title VII).

## III.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

3.    Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) within 180 days of the last discriminatory act (Exhibit A).

4.    Plaintiff further sued within ninety (90) days after receipt of the right-to-sue letter issued by the EEOC (Exhibit B).

## IV.    PARTIES

5.    Plaintiff, Anthony Rosa, ("Plaintiff" or "Rosa") is a resident of Macon County, and performed work for the Defendant in the counties composing the Middle District of Alabama, Northern Division, during the events of this case.  Thus, under 28 U.S.C. § 1391(b), venue for this action lies in the  Division.

6.    Defendant Auburn University – Montgomery ("AUM" or "Defendant") is a public university incorporated under the laws of Alabama Code §16-48-1 *et. al.*

7.    Defendant employs at least five hundred (500) full-time employees.

8.    Defendant Auburn ("Auburn" or "Defendant") is a public university incorporated under the laws of Alabama Code §16-48-1 *et. al.*

9.    Defendant employs at least five hundred (500) full-time employees.

## V.    FACTS

10.    Plaintiff incorporates by reference and realleges each of the preceding paragraphs as if set out herein.

11.    Rosa began his employment with defendant on or about October 1, 2014, as Campus Services Fleet Coordinator.

12.    Rosa received promotions to Campus Services Manager.

13.    Rosa's sister was also employed at AUM as the Athletic Director.

14.    Rosa's sister, Jessica Rosa was in a same-sex relationship with an employee.

15.     Jessica Rosa disclosed her relationship to her direct supervisor, Chancellor Carl Stockton, pursuant to the "Consensual Relationship Policy" at AUM.

16.     Chancellor Carl Stockton disclosed the relationship to Leslie Meadow in Human Resources.

17.     Chancellor Carl Stockton had previously told Jessica Rosa that a donor complained to him about supporting gay individuals and withdrew his financial bequest from the school.

18.     Chancellor Carl Stockton told Rosa's sister he had looked her up on Facebook and didn't see anything crazy on there.

19.     Scott Parson's is the Chief Financial Officer ("CFO").

20.     Seventy percent of the staff reports to Scott Parsons.

21.     Scott Parsons told the Chief Information Officer he felt Jessica Rosa should not be Athletic Director because she was too young, gay and female.

22.     Human Resources, including Leslie Meadows, reports to Scott Parsons.

23.     Rather than consider alternative management plans for Rosa's sister, AUM terminated Rosa.

24.     Rosa's sister filed an EEOC charge on or about April 14, 2022, against AUM and Auburn Universities.

25.    After Rosa's sister filed her charge, AUM and Auburn University engaged in a pattern of retaliation against the remaining family members who were still employed at AUM and Auburn.

26.    Rosa's father umpired softball games at AUM.

27.    Rosa's father was open with the Assignor about Jessica Rosa's case.

28.    The Assignor knew Rosa's father was professional, can be fair, and is impartial, so he assigned him to umpire for six AUM games during the 2023 season.

29.    Chancellor Carl Stockton, who is normally very boisterous, cheering, and acting like a fool during softball games noticed Rosa's father was the umpire.

30.    Chancellor Carl Stockton sat quietly, glaring at Rosa's father throughout the three games that took place over that weekend.

31.    There were no issues related to Rosa's father's decisions during the games.

32.    AUM won all three games.

33.    Upon information and belief, the next day, Chancellor Carl Stockton called the Gulf State Conference Commissioner and had Rosa's father blocked from working future AUM games because of Jessica Rosa's case.

34.    Chancellor Carl Stockton was the only one who had a problem with Rosa's father umpiring the games.

35.    Under normal circumstances, any umpire issues during the games are handled from the coach to the Assignor.

36.    Any issues outside the field of play involving umpire and fan interaction are handled from the Athletic Director to the Assignor.

37.    Prior to the weekend's games, the entire athletics staff was aware of who was assigned to the games.

38.    The softball coach was also aware who was calling the games.

39.    The softball coach believed Rosa's father to be one of the better umpires in the Gulf South Conference and knows she will have a well umpired game when he is present.

40.    At the end of the season, the softball coach held a conversation with Rosa's father at the high school state playoffs.

41.    In February of 2023, Rosa hired an athletic tech to take care of the fields.

42.    The athletic tech, Chasen Laney, was in a heterosexual relationship with a softball coach.

43.    Chasen Laney did not (and was not required to) report this relationship to Rosa in the interview.

44.    Neither Chasen Laney nor the Softball Coach voluntarily disclosed this consensual relationship pursuant to the consensual relationship policy or conflict of interest policies.

45.    About a week after Chasen Laney was hired, he spoke with HR representative Stacy Holley who casually asked if he was married.

46.    Chasen Laney responded that he was in a relationship with the Softball Coach.

47.    Chasen Laney did not work with softball.

48.    Chasen Laney worked prepping the softball field, but he reported directly to the Landscape Management Supervisor who reported directly to Rosa.

49.    Rosa argued there was no conflict of interest and that they only needed to make a management plan pursuant to the Consensual Relationship Policy as this is what should have been done in his sister's case.

50.    Instead of properly following policy and preparing a management plan, their "management plan" was that he could not "work softball"—which they stated he could not mow or maintain the softball field.

51.    This meant Rosa was required to mow and maintain the softball fields himself in addition to his normal duties.

52.    Rosa was told "big" Auburn and HR made the decision there was a conflict.

53.    If they had made a management plan and followed policy, it would have bolstered Rosa's sister's case, so they initially did not do that in this case.

54.    About a month later, around April of 2023, Chasen Laney was told to come to Human Resources by Leslie Meadows to talk to them about his relationship with the Softball Coach.

55.    It was determined that Chasen Laney did nothing wrong, but Scott Parsons and the HR Director Leslie Meadows said there was a conflict because he worked softball (which was false).

56.    Leslie Meadows required Chasen Laney to fill out a conflict-of-interest form.

57.    Chasen Laney requested to speak to someone higher up at Auburn.

58.    Leslie Medows told Chasen Laney she would try, but this never happened.

59.    Chasen Laney was told to sign the form or be fired.

60.    The management plan between Chasen Laney and the Softball Coach went into effect in May of 2023.

61.    Rosa was told they wanted to make sure Chasen Laney was not in direct contact with the Softball Coach.

62.    On or about April 27, 2023, a position came open that would have been a promotion for Rosa.

63.    Rosa applied for the position, Executive Director of Facilities and Operations in Financial and Administrative Services..

64.    On or about May 1, 2023, the University baseball offices were broken into.

65.    On or about May 2, 2023, the Assistant Athletic Director became aware of guns on the premises at the time of the break in.

66.    On or about May 17, 2023, someone attempted to break into the University facilities again.

67.    Rosa and the baseball coach caught someone attempting to drive away with a U-Haul that was left on campus and linked to the May 1 and May 17 break-ins.

68.    During the encounter, the individuals threatened to shoot Rosa and the baseball coach if they didn't get out of the way.

69.    That same day, Rosa and the baseball coach found the U-Haul a short time later and called the police.

70.    At this time, the Assistant and Head coach spoke of and looked for stolen guns.

71.    At this time and during this encounter, Rosa learned for the first time of a gun that was formerly on the campus and stolen in the May 1, 2023, break in.

72.     When the police arrived about an hour later, Rosa encouraged the Assistant and Head Coach to report the stolen gun to the municipal police.

73.     Rosa was present when the Assistant and the Head Coach reported the stolen gun to the municipal police on May 17.

74.      On or about May 19, 2023, Rosa appeared for his first interview with Campus police and gave a verbal statement to the Campus police about the events that happened on May 17.

75.     As Rosa gave his statement to Campus police, the Chief asked Rosa if he had anything to add to his statement about what happened on May 17.

76.     When Rosa was asked if he had anything to add, he volunteered information about the gun that was stolen in the break in on May 1, 2023.

77.     Chief responded to Rosa telling him it was all on the body cam of the municipal officer.

78.     Rosa was asked by the Chief why he didn't tell them about the guns two days prior.

79.     Rosa stated there was a lot going on, the gun was no longer on Campus at that time, and he knew it was already reported to the municipal police.

80.     Rosa apologized to the Chief for her finding out by watching the body cam footage.

81.     Chief Mitchell stated Rosa gave her all the information she needed.

82.    This conversation was recorded on an AUM officer's body cam.

83.    On or about May 22, 2023, Rosa was called into HR.

84.    Rosa was told to turn his phone off and not to record any meetings.

85.    Rosa's sister had recorded meetings that she had used to support her charge of discrimination, so this is in direct retaliation for her charge and lawsuit.

86.    During the meeting with HR, they treated Rosa as if he knew about the gun on Campus before May 17, 2023.

87.    Rosa told them he did not know about the gun before May 17, 2023.

88.    Rosa was bullied during this meeting even though he fully cooperated.

89.    The meeting concluded, but they called Rosa back a couple hours later.

90.    Rosa was placed on administrative leave with pay while they "investigated" the matter.

91.    They told Rosa to remain on "ready to work" status.

92.    Rosa was never given a duration for his paid leave, which is his right in accordance with AUM Policies and Procedures.

93.    Rosa was not told why he was being placed on leave, only that he was being placed on leave.

94.    Rosa was never told he had committed a serious violation.

95.    The Coaches were both placed on leave for having guns on Campus.

96.     The Assistant Athletic Director, Tim Lutz, was interviewed about his knowledge of the guns being on Campus, but he was not told to turn off his phone or to not record.

97.     Tim Lutz told them he had learned about the guns the night they were stolen but thought it had already been reported so he did not report it himself.

98.     Tim Lutz also told Rosa he believed Erik Maas, Athletic Director (white, heterosexual, male who replaced Rosa's sister) knew about the gun shortly after they were stolen.

99.     Erik Maas, upon reviewing the police report and noticing the guns were not in the report, did not then report the guns.

100.    This information about Erik Maas knowing about the guns earlier was reported to HR during the investigation.

101.    Neither Tim Lutz nor Erik Maas were disciplined in any way for not reporting the gun when they had knowledge which was a few weeks prior.

102.    Neither Tim Lutz nor Erik Maas were intimidated, bullied, or told how serious this was.

103.    Neither Tim Lutz nor Erik Maas were placed on administrative leave or terminated.

104.    Neither Tim Lutx nor Erik Maas' sibling had filed an EEOC charge that they supported.

105.    On or about May 23, 2023, after Rosa was placed on administrative leave and no longer on the premises, Scott Parsons held a meeting with the Chasen Laney wherein he told him that there was no conflict and the "management plan" would be dropped and he could work on the fields going forward.

106.    Scott Parsons made these comments in front of Amber Rea Childers, Erik Maas, Christopher White and Leigh Easterwood.

107.    The fact that Scott Parsons decided there was no conflict with Chasen Laney and the softball coach immediately after Rosa was placed on leave and no longer on Campus made it clear the alleged "conflict" was directly related to Rosa and his sister's case.

108.    Scott Parsons did not realize Rosa would learn the alleged "conflict" was deemed not to be a conflict and the management plan was removed.

109.    Rosa went to Auburn University to speak with HR, but they refused to see him.

110.    From May 29, 2023, to June 5, 2023, Rosa was scheduled for preapproved vacation.

111.    Rosa was never told this time off was not paid administrative leave for which he had to be in "ready to work" status.

112.    Rosa kept his phone by his side in case he had to come back to work.

113.    On or about June 5, 2023, Rosa was called back into HR to meet with Leslie Meadows and Scott Parsons.

114.    HR started the meeting by telling Rosa he had been off for one week vacation which was not true.

115.    HR began bullying and harassing Rosa again.

116.    Scott Parsons talked over Rosa and would not allow him to answer the questions presented.

117.    Scott Parsons and Leslie Meadows were two key people in Jessica Rosa's lawsuit.

118.    It was clear they were not impartial because of Jessica Rosa's lawsuit.

119.    Scott Parsons and Leslie Meadows told Rosa he was in violation of a Group I violation based on not reporting firearms on campus.

120.    Rosa explained he was not guilty of a Group I violation because there were no guns on the property when he learned of the guns.

121.    Nowhere in the AUM policies and procedures manual does it list reporting guns that are not on campus when learned of them.

122.    Rosa encouraged the reporting of the gun to the municipal police and volunteered information relating to the gun during his conversation with Campus police.

123.    Scott Parsons began to intimidate and bully Rosa again.

124. Scott Parsons asked Rosa if he understood the seriousness of the situation and that guns on campus were a big deal.

125. Rosa said guns on campus were a big deal but there were no guns on campus when he found out.

126. Leslie Meadows and Scott Parsons told Rosa they were going to write him up.

127. A write up would make Rosa ineligible for the promotion he had applied for.

128. Rosa explained he would like equal representation at the meeting and would continue to answer questions so long as he had equal representation.

129. Leslie Meadows asked Rosa, "What? So you can be coached?".

130. Rosa asked what the purpose of the meeting was.

131. They told him the purpose of the meeting was to go over their outcomes of the investigation.

132. Rosa said okay and asked to see their findings, but they refused to share their findings with him.

133. Instead, Scott Parsons stopped the meeting, and told Rosa they needed some time, and that they could reconvene.

134. Rosa agreed.

135. Scott Parsons said they would be in touch, and Rosa said okay.

136.   After this meeting, HR never contacted Rosa, and they never reconvened.

137.   On or about June 8, 2023, an email was sent out to all AUM staff asking for nominations for a grievance committee so that HR (whom his grievance was against) could select a committee.

138.   A grievance committee should have already been in place to review Rosa's case which started on May 22, 2023.

139.   On or about June 12, 2023, Rosa was terminated.

140.   Rosa received a letter that he was terminated on or about June 13, 2023.

141.   The letter was signed by Scott Parsons.

142.   After his termination, Rosa learned interviewing for the position he applied for took place when he was placed on administrative leave.

143.   Rosa was not granted an interview.

144.   AUM stated reason for Rosa's termination was because he had violated the Auburn University Duty to Cooperate Policy and Section 7.1.3(d)(1) of the Auburn University at Montgomery Personnel Policy and Procedures which prohibits employee conduct that constitutes, "major misconduct, insubordination, gross negligence, or gross disregard to the obligation of the University".

145.   There is no section 7.1.3.(d)(1) to the policy, Rosa believes the language quoted was from section 7.1.3 (10).

146.   Regardless, AUM stated Rosa had a duty to report and withheld critical information during an investigation of criminal acts that occurred on campus" about the firearms.

147.   On July 5, 2023, Rosa emailed Leslie Meadows that he would be on campus to pick up his personal items on July 6 at 3:00 p.m., and requested his last 13 pay stubs, copies of statements he made to police, and forms for the grievance process.

148.   On July 10, 2023, Rosa sent Leslie Meadows an email that his personal items were damaged or missing.

149.   Rosa also explained he still had a master key that he would return when he picked up his missing items valued at $97.93.

150.   On July 11, 2023, Leslie Meadows wrote back claiming none of the items were damaged by them, and that the police department had some of his items.

151.   Leslie Meadows told him to bring back the key and pick up the items by July 12, 2023.

152.   When Rosa went to pick up his personal belongings he spoke with Chief Mitchell.

153.   Rosa asked Chief Mitchell if she thought he was uncooperative in her investigation.

154.   She stated she did not think he was uncooperative during the investigation, and that he gave her everything she needed for her part of the criminal investigation.

155.   On or about July 20, 2023, Rosa received an email that he did not receive the position of Executive Director of Facilities and Operations in Financial and Administrative Services.

156.   On or about July 27, 2023, Rosa filed a formal grievance alleging due process violations, and that he was the victim of retaliation.

157.   On or about August 1, 2023, Rosa received a letter from the Chair of the AUM Staff Grievance Committee indicating:

    a.  The termination would be evaluated by the staff grievance hearing panel;

    b.  The misapplication of the Employee Duty to Cooperate Policy would be evaluated by the staff grievance hearing panel;

    c.  The issue of discrimination and harassment would not be evaluated by the grievance hearing panel, but those claims would be referred to Auburn University to review;

  d. That the issue of promotion would not be evaluated by the staff grieving hearing panel; and finally

  e. That his grievance would be redacted to remove information from the grievance panel.

158. The rules for the hearing provided, "An official record (tape recorded or otherwise) of the hearing will be made by the Hearing Panel. A copy may be made available to each party upon request."

159. On September 11, 2023, Rosa received notice that he could not have his sister or his other witness, Tim Lutz testify at the hearing.

160. Tim Lutz had been willing to be a witness during the EEO process, but was not willing to be a witness to the AUM grievance.

161. On September 14, 2023, the grievance committee held a hearing wherein Rosa presented evidence of his full cooperation in the investigation and how he encouraged the coaches to report the gun.

162. At the hearing, Rosa, Scott Parsons, Chief Brenda Mitchell, and Leslie Meadows testified.

163. At the hearing body cam evidence was reviewed showing Rosa encouraging the assistant head coach and the head coach to report the gun to municipal police.

164.   At the hearing, the body cam evidence was reviewed showing Rosa volunteering information about the guns to the Chief of AUM police during his May 19 interview.

165.   Chief Mitchell testified inconsistent with the videos, and contrary to her prior statement to Rosa that he had cooperated and not withheld information.

166.   Upon cross examination of Chief, the panel members appeared to shake their head in agreement with Rosa that he had cooperated and volunteered information.

167.   At the conclusion of the hearing, Rosa verbally requested a copy of the official record as the hearing was tape recorded and a copy of the body cam evidence that was presented at the hearing.

168.   AUM was provided with an exorbitant amount of time to provide the recording.

169.   Rosa received information that Carl Stockton had corrupted the recording.

170.   Carl Stockton should not have had the recording when he corrupted it.

171.   On October 2, 2023, Paige Hines provided Rosa a copy of the AUM Grievance Hearing Panel recommendation.

172.   On October 3, 2023, Rosa formally requested a copy of the recording of the hearing in writing along with the body cam evidence presented at the hearing.

173.    On October 3, 2023, Paige Hines, a member of the panel wrote Rosa and told him she would find out who has a copy of hearing and the body cams and let them know he is requesting them.

174.    On October 9, 2023, when Rosa had not received anything, he followed up on his request for the recording and body cam evidence.

175.    On October 10, 2023, Paige Hines responded stating she was sorry he hadn't received a response yet, and that she had emailed HR to let them know what he had requested.

176.    On October 24, 2023, Rosa again followed up on the request.

177.    On October 25, 2023, Paige Hines told Rosa he should contact his attorney to call the Auburn Attorney.

178.    On October 30, 2023, Rosa received a letter from Tonya Dupree, Sr. Director of Human Resources and Compliance that stated,

> The hearing was recorded. However, following the hearing the file storing the recording was corrupted and cannot be recovered. The recording of the hearing cannot be shared because AUM no longer has a recording of the hearing. However, the chair of the hearing committee has compiled a Memorandum of Hearing. This Memorandum is attached.

> AUM cannot share the body cam video that was shown during the hearing because it is information that is part of the ongoing criminal investigation.

179.    The grievance committee ignored the clear evidence of Rosa's cooperation and volunteering information, and concluded Rosa violated the

Employee Duty to Cooperate, and committed major misconduct, both of which were false.

180.   On October 30, 2023, Carl Stockton approved the University Grievance Committee's Hearing Panel recommendation.

181.   On August 23, 2023, Rosa received notice from Auburn's Office of Affirmative Action/Equal Employment Opportunity & Title IX, that Jeff Lamoureaux would be investigating the claim that he was being retaliated against based on his sister's EEOC Charge.

182.   During its investigation, the EEO would not hear evidence relating to how Rosa's father was banned by Stockton, and how the management plan of Laney was handled.

183.   During the EEO investigation, AUM provided Auburn with knowingly false information relating to Rosa.

184.   On September 21, 2023, Auburn University completed their EEO investigation that he was terminated due to his sister filing an EEOC Charge and claimed there was no retaliation.

185.    One of the reasons Auburn University said there was no evidence of retaliation was that the coaches were also terminated in the investigation.

186.   But the coaches were the ones who were guilty of the offenses while Rosa was not.

187.   The employee whom Jessica Rosa was in a relationship with is now her wife.

188.   She has experienced retaliation and harassment at her job at AUM as well.

189.   Yet another employee who served as an interim Athletics Director was questioned about her ability to perform the job because of her friendship with Jessica Rosa.

190.   This individual was pressured into not applying for the Athletics Director position.

## VI.    CLAIMS

### COUNT I- TITLE VII -THIRD PARTY RETALIATION

191.   Plaintiff incorporates by reference and realleges each of the preceding paragraphs as if set out herein.

192.   Plaintiff has established a convincing mosaic of direct and circumstantial evidence that he was subjected to third party retaliation from his sister's protected EEOC Charge of Gender Discrimination in violation of Title VII.

193.   Plaintiff was qualified for the position and able to perform the essential functions of the job.

194.   Plaintiff did not violate any policies as he fully cooperated with the investigation and did not withhold any information to AUM during its investigation.

195.    Defendant had a pattern of retaliating against Rosa's friends and family for her sister's complaint as it had banned her father from umpiring games, questioned the interim Athletic Director of her ability to perform the position due to her relationship with Rosa, and then pressured her into not applying for the job.

196.    Defendants violated Title VII by placing Rosa on administrative leave, failing to promote Rosa, and then terminating Rosa for false reasons after his sister engaged in protected activity. Defendants also engaged in retaliation when it wrongfully accused Rosa of failure to cooperate and withholding information during a criminal investigation, disregarded exculpatory evidence, intentionally destroyed evidence (the recording of the hearing), falsified findings in its reports and misstated what the body cam evidence clearly showed, and ratified the wrongful retaliatory decisions at the grievance committee level and Auburn EEO level.

197.    Because of Defendant's violation of Title VII, Plaintiff has been damaged suffering loss of pay, benefits, and mental anguish.

## COUNT II- TITLE VII – RETALIATORY HOSTILE WORK ENVIRONMENT

198.    Plaintiff incorporates by reference and realleges each of the preceding paragraphs as if set out herein.

199.   Plaintiff has been subjected to a retaliatory hostile work environment based on his sister's complaint to the EEOC of gender discrimination in violation of Title VII.

200.   Plaintiff was qualified for the position and able to perform the essential functions of the job.

201.   Plaintiff did not violate any policies as he fully cooperated with the investigation and did not withhold any information to AUM during its investigation.

202.   Defendant had a pattern of retaliating against Rosa's friends and family for her sister's complaint as it had banned her father from umpiring games, questioned the interim Athletic Director of her ability to perform the position due to her relationship with Rosa, and then pressured her into not applying for the job.

203.   Defendants violated Title VII by placing Rosa on administrative leave, failing to promote Rosa, and then terminating Rosa for false reasons after his sister engaged in protected activity. Defendants also engaged in retaliation when it wrongfully accused Rosa of failure to cooperate and withholding information during a criminal investigation, disregarded exculpatory evidence, intentionally destroyed evidence (the recording of the hearing), falsified findings in its reports and misstated what the body cam evidence clearly showed, and ratified the wrongful retaliatory decisions at the grievance committee level and Auburn EEO level.

204.    Because of Defendant's violation of Title VII, Plaintiff has been damaged suffering loss of pay, benefits, and mental anguish.

VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.    Grant Plaintiff a permanent injunction enjoining the Defendant, its agents, successors, employees, attorneys and those acting with the Defendant and at the Defendant's request from continuing to violate the terms of Title VII of the Civil Rights Act of 1964;

B.    Enter an Order requiring the Defendant to make Plaintiff whole by awarding reinstatement to the position he would have had, had she not been terminated;

C.    Award back pay, with employment benefits, front pay, liquidated damages; compensatory damages, special damages; punitive damages nominal damages;

D.    Attorneys' fees and costs;

E.    Plaintiff requests that the Court award Plaintiff equitable relief as provided by law; and,

F.    Any different or additional relief as determined by the Court to which Plaintiff is entitled.

## THE PLAINTIFF REQUESTS A JURY TRIAL

/s/ Patricia A. Gill

Patricia A. Gill

**OF COUNSEL:**

The Workers' Firm
2 20th Street North, Suite 900
Birmingham, Alabama 35203
T: 205.329-6392
trish@theworkersfirm.com

## PLEASE SERVE DEFENDANT AS FOLLOWS

Auburn University-Montgomery
Care of Carl Stockton, Chancellor
7400 East Montgomery Drive
Montgomery, AL 36117

Auburn University
Care of Christopher B. Roberts, President
Office of the President
107 Samford Hall
Auburn, AL 36849